UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

RANDY WILLOUGHBY,

    Plaintiff,

v.                            Case No. 8:23-cv-1260-KKM-NHA

GOVERNMENT EMPLOYEES
INSURANCE COMPANY,

    Defendant.

_____

## ORDER

GEICO moves for summary judgment on Plaintiff Randy Willoughby's bad-faith insurance claim. I grant in part and deny in part GEICO's motion. Mot. for Summ. J. (MSJ) (Doc. 128).

## I.   BACKGROUND

On November 2, 2012, Eddie Ellison negligently operated his vehicle and caused a collision with the passenger side of a sedan. Joint Statement of Undisputed Facts (JSUF) (Doc. 127) ¶ 1. Randy Willoughby, a passenger in the sedan, suffered "severe head tra[u]ma" and was left permanently injured. *Id.* ¶ 1; (Doc. 127-1) at 2. At the time of the accident, Ellison and his wife had a GEICO insurance policy with a $100,000 liability limit per person for bodily injury and a $100,000 liability limit for property damage. JSUF ¶ 2;

1

(Doc. 1-1) at 11–42. The policy also stated that GEICO would, upon request by the insured, provide reimbursement for "[c]osts incurred by any insured for first aid to others at the time of an accident involving an owned auto or non-owned auto" and "[a]ll reasonable costs incurred by an insured at [GEICO's] request." (Doc. 1-1) at 26; *see* JSUF ¶ 3.

Within a few days after the accident, GEICO learned that Willoughby suffered serious injuries and was in a coma. JSUF ¶ 4; (Doc. 127-3) at 2. On November 7, 2012, five days after the accident, GEICO determined that Ellison was 100% liable for the accident. JSUF ¶ 5; (Doc. 127-5). The next day, GEICO sent a letter to Ellison advising him of the available coverage and informing him that Willoughby's claims may exceed the coverage limits. JSUF ¶ 6; (Doc. 127-6). The same day, GEICO informed the primary adjuster, Jodie Prendes, that she had the authority to offer the $100,000 bodily injury limit to Willoughby in exchange for a release and upon confirmation that "Randy Willoughby is competent or if he is not competent[,] someone is or will be appointed to represent his interests." JSUF ¶ 7 (alteration in the original); (Doc. 127-7).

On November 12, 2012, GEICO attempted to contact Willoughby's family both at his home address and the hospital. JSUF ¶ 8; (Doc. 127-8). At the hospital, Willoughby's father asked the GEICO field representative to leave. (Doc. 127-8) at 2. The GEICO representative also learned the full extent of Willoughby's injuries, including a

head injury, facial fractures, and a fractured pelvis. *Id.* at 4. In total, between November 9, 2012, and November 29, 2012, GEICO wrote six letters to Willoughby and his parents regarding the claim. JSUF ¶ 9; (Doc. 127-9). GEICO offered the $100,000 bodily injury policy limit, provided more information about the insurance policy, and included a claims release. *Id.*

On December 6, 2012, GEICO learned that Willoughby retained Swope, Rodante P.A. (SRPA) as counsel. JSUF ¶ 10; (Doc 127-10). The next day, GEICO's field representative went unannounced to SRPA's office and received confirmation that SRPA represented Willoughby. JSUF ¶ 10; (Doc. 127-11) at 1–2. On the same day, GEICO's claims adjuster mailed a $100,000 check, along with a claims release, to SRPA. JSUF ¶ 11; (Doc. 127-12). A few days later, a SRPA attorney told GEICO that Willoughby had not decided how he wanted to proceed. JSUF ¶ 12; (Doc. 127-13). Over the next six months, GEICO sent letters to SRPA regarding Willoughby's claims. JSUF ¶ 13; (Doc. 127-14) at 44–52. Then, on June 20, 2013, SRPA returned the check to GEICO, rejected the offer, and informed GEICO about Willoughby's suit against the Ellisons. JSUF ¶ 14; (Doc. 127-15).

Willoughby sued Ellison for negligence and Ellison's wife for vicarious liability based on Ellison's negligence. JSUF ¶¶ 15–16. Willoughby also sued his uninsured motorist carrier for denying his claim for benefits. *Id.* ¶ 15. At the time, Willoughby "was

unwilling to settle his claims against the Ellisons on any terms, other than by entry of a judgment for the full amount of his damages." *Id.* In his claims against the Ellisons, Willoughby alleged that he suffered "permanent bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, and loss of earnings and loss of ability to earn money." (Doc. 127-15) at 5–6. GEICO provided counsel to the Ellisons. JSUF ¶ 17; (Doc. 127-16). Although Willoughby did not seek property damages in his complaint, his response to an interrogatory in August 2013 enumerated $230 in property damages. JSUF ¶ 18; (Doc. 127-17) at 6.

During mediation in February 2015, Willoughby settled his first-party bad faith claim against his uninsured motorist carrier for $4 million. JSUF ¶ 19. Willoughby offered to settle his claims against the Ellisons for $150,000. *Id.* According to GEICO, this offer included $50,000 in taxable costs. (Doc. 127-18) at 1. After discussing with Richard Young, GEICO's outside extracontractual attorney, GEICO concluded that its policy with the Ellisons did not cover costs and, as a result, GEICO would not agree to pay them. *Id.* GEICO thus considered the $150,000 settlement offer an excess demand. *Id.*

Brandon Cathey, Willoughby's counsel, reiterated the $150,000 offer in a March 2015 email to the Ellisons' counsel Douglas Wight. JSUF ¶ 20a; (Doc. 127-19) at 1. Cathey wrote that Willoughby "would still prefer to settle all of [his] claims against the

4

Ellisons within their policy limit with GEICO." (Doc. 127-19) at 1. Cathey wrote that, "[i]n exchange for payment in the amount of $150,000, Randy Willoughby will sign a general release of all his claims against the Ellisons arising from the collision on November 2, 2012, including all claims for taxable costs and attorneys fees." *Id.* Wight responded that he would take the offer to GEICO and the Ellisons, but that GEICO was not willing to offer above the policy limits and the Ellisons were unable to offer any money on their own. JSUF¶ 20b; (Doc. 127-19) at 2. In reply, Cathey mentioned authority "supporting the idea that Geico covers taxable costs and other types of damages against your clients in addition to the 100k limit." JSUF ¶ 20c; (Doc. 127-19) at 3.

Wight forwarded this information to the Ellisons and informed them that Willoughby was interested in receiving a counteroffer of "somewhere between your policy limits of $100,000.00 and [his] $150,000.00 demand." JSUF ¶ 20d; (Doc. 127-19) at 20. In conversation with a GEICO supervisor Kirsten Tabile, Wight opined that a counter of $125,000 would settle the case. JSUF ¶ 20e; (Doc. 127-20) at 1. Tabile wrote in an email that the $25,000 "would be [extracontractual] money" because she believed that GEICO's policy did not cover costs. *Id.*

Later in March 2015, Cathey followed up with another email indicating a willingness to settle and acknowledging that there were good arguments on both sides as to whether GEICO owed taxable costs under the policy. JSUF¶ 20f; (Doc. 127-19) at 6.

5

At the same time, Cathey argued that given the authority cutting in Willoughby's favor, GEICO "*could* owe as much as $150,000." (Doc. 127-19) at 6 (emphasis in the original). Cathey told Wight that Willoughby would "settle for less," but that they needed "some kind of offer from Geico to acknowledge it owes something more than $100,000." *Id.* "Geico can even start by offering $100,000 plus $200 if it wants," Cathey said, "just please get them to offer SOMETHING so we can get this settled!" *Id.* Wight forwarded this communication to Prendes, the primary adjuster, and Wight later informed Cathey that GEICO employees planned to meet to discuss the settlement on April 16, 2015. JSUF ¶ 20g, 20h; (Doc. 127-19) at 9; (Doc. 127-21) at 1. Cathey responded that if GEICO "can offer something over the $100,000, [he] guarantee[d that] we can settle this case." JSUF ¶ 20i; (Doc. 127-19) at 10.

At the April 16 meeting, though, GEICO employees consulted with attorney Young, who opined that the policy did not cover taxable costs. JSUF ¶ 21; (Doc. 127-22) at 1–2. As a result, GEICO decided not to counteroffer anything over the $100,000 bodily injury limit and GEICO's claim examiner, Dan Anthony, informed Wight of that the next day. JSUF ¶ 22; (Doc. 127-23); *see* Jones Dep. (Doc. 120-1) at 127:18–23 (agreeing that the decision to reject the settlement offer was "on the basis that the GEICO policy applicable to this claim does not cover court costs charged against the insured"). Wight then informed Cathey that GEICO "will not offer anything above the $100,000.00 bodily

injury limit that was previously offered." (Doc. 127-19) at 14. Therefore, Wight said, because the Ellisons were not able to pay anything, if Willoughby is "unwilling to accept their $100,000.00 bodily injury limits, then it appears that we will need to proceed with litigation." *Id.* Cathey concurred because the "line Geico has drawn at $100,000—when other parts of the policy provide benefits that could be used to settle this case—is a decision Geico is obviously going to stick to regardless of the consequences to [the Ellisons]." *Id.* at 15.

Over the next few months, attorneys for the Ellisons sent GEICO copies of Florida decisions—one of which, *New Hampshire Indemnity Company v. Gray*, 177 So. 3d 56 (Fla. 1st DCA 2015), concerned a policy with "virtually identical" language—that concluded the insurer was responsible for litigation costs. JSUF ¶ 24; (Doc. 127-24); (Doc. 127-25). GEICO responded that *Gray* contradicted *Steele v. Kinsey*, 801 So. 2d 297 (Fla. 2d DCA 2001), a decision of the Second District Court of Appeal, which controlled here because Willoughby's case arose in Florida's Second District. JSUF ¶ 24; (Doc. 127-26). Two years later, in 2017, the Florida Supreme Court disapproved *Steele* and held that a materially identical policy provision "must be construed to provide coverage for the costs and attorneys' fees." *Gov't Emps. Ins. Co. v. Macedo*, 228 So. 3d 1111, 1115 (Fla. 2017).

Back in July 2015, Wight, with GEICO's approval, stipulated to a damages-only

trial. JSUF ¶ 25; (Doc. 127-27). Under the stipulation, the jury would be asked to

determine the amount of damages sustained by Willoughby for:

> medical expenses incurred in the past; medical expenses to be incurred in
> the future; lost earnings incurred in the past; loss of earning capacity in
> the future; property damage incurred in the past; pain, suffering,
> disability, physical impairment, disfigurement, mental anguish,
> inconvenience, aggravation of a disease or physical defect, and loss of
> capacity for the enjoyment of life sustained in the past; and pain,
> suffering, disability, physical impairment, disfigurement, mental anguish,
> inconvenience, aggravation of a disease or physical defect, and loss of
> capacity for the enjoyment of life to be sustained in the future.

(Doc. 127-27) at 1–2.

In August 2015, Cathey sent Wight a proposed stipulation for entry of final

judgment for $5,000,000, "which was itemized by past and future medical expenses, past

and future loss of earnings, property damage, and past and future pain and suffering." JSUF

¶ 26; (Doc. 127-28). Willoughby served proposals in October 2015 for settlement on the

Ellisons, which included the same terms as the August proposed stipulated judgment.

JSUF ¶ 26; (Doc. 127-29). Prendes, the GEICO adjuster, advised the Ellisons that they

may be personally liable for a judgment in excess of the policy limits and that if they did

not accept the proposals for settlement and a jury verdict exceeded the offer by 25%, then

they would be responsible for attorney's fees and costs. JSUF ¶ 27; (Doc. 127-30).

8

A year later, in response to a September 2016 offer of a $5 million consent judgment, the Ellisons indicated that they wished to accept the offer. JSUF ¶ 28; (Doc. 127-31) at 1–5; (Doc. 127-32) at 1. GEICO informed a new attorney for the Ellisons, James Thompson, that GEICO would "not agree to waive policy defenses of lack of cooperation and voluntary payment." (Doc. 127-32) at 1. GEICO maintained this position even if after the Ellisons and Willoughby "conditionally agreed to a stipulated judgment in the amount of $4.8 million, subject to GEICO waiving any policy defense relating to the signing of the stipulation." JSUF ¶¶ 29–30; (Doc. 127-33) at 2; (Doc. 127-34) at 1.

Eventually, in March 2017, Cathey offered to settle with Eddie Ellison "in exchange for payment of the $100,000 per person bodily injury liability insurance limit." (Doc. 127-35) at 2; *see* JSUF ¶ 31. GEICO accepted this offer and Mr. Ellison was dropped as a party from the underlying action. JSUF ¶ 32; (Doc. 127-36). Cathey then offered entry of a judgment in the amount of $4.8 million against Mrs. Ellison. JSUF ¶ 34; (Doc. 127-37) at 1. Cathey argued that GEICO needed to agree only that Mrs. Ellison "will not be breaching her insurance policy now by protecting herself with this agreement." *Id.* GEICO, though, remained steadfast in its opposition to a consent judgment in excess of the policy limits, informing the parties that GEICO may seek a declaration that Ellison breached the policy if she signed the proposed stipulation and consent judgment. JSUF ¶ 35; (Doc. 127-38) at 1.

9

In December 2018, Willoughby for the first time offered to settle his property damage claim on its own. JSUF ¶ 36; (Doc. 127-39). GEICO agreed and paid $299.22 in property damages before trial. JSUF ¶ 37. As a result, Willoughby signed a release of his property damage claim against Mrs. Ellison. (Doc. 127-40).

Before trial, in February 2019, Cathey again offered the stipulated $4.8 million dollar consent judgment. JSUF ¶ 38; (Doc. 127-41) at 1. GEICO responded that its position was unchanged and that "in the event [the Ellisons] enter into a consent judgment or stipulation with the plaintiff, GEICO specifically reserves its rights to assert all available policy defenses for the unauthorized execution of any such agreement." JSUF ¶ 38; (Doc. 127-42) at 2.

After a jury trial, final judgment was entered against Mrs. Ellison for $30,148,619. JSUF ¶ 39; (Doc. 127-44) at 1. Because Mrs. Ellison failed to accept the pre-trial proposal for settlement, Willoughby was entitled to attorney's fees and costs, which GEICO paid in the amount of $400,000. JSUF ¶ 39; (Doc. 127-45).

Willoughby later initiated this bad-faith action, which GEICO removed to federal court. (Docs. 1, 1-1). GEICO's motion for summary judgment (Doc. 128) is ripe for resolution.

10

## II. LEGAL STANDARD

Summary judgment is appropriate if no genuine dispute of material fact exists, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A fact is material if it might affect the outcome of the suit under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant always bears the initial burden of informing the district court of the basis for its motion and identifying those parts of the record that demonstrate an absence of a genuine issue of material fact. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). When that burden is met, the burden shifts to the nonmovant to present evidentiary materials (e.g., affidavits, depositions, exhibits, etc.) demonstrating that there is a genuine issue of material fact, which precludes summary judgment. *Id.* A moving party is entitled to summary judgment if the nonmoving party "fail[s] to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court reviews the record evidence as identified by the parties and draws all legitimate inferences in the nonmoving party's favor. *See Sconiers v. Lockhart*, 946 F.3d 1256, 1262 (11th Cir. 2020); FED. R. CIV. P. 56(c)(3).

## III.    ANALYSIS

Florida law governs this bad faith insurance case. *Mesa v. Clarendon Nat. Ins. Co.*, 799 F.3d 1353, 1358 (11th Cir. 2015) (per curiam). "The third-party bad faith cause of action permits the insured or the injured third party to sue an insurer for failing to settle within the policy limits." *Fridman v. Safeco Ins. Co. of Ill.*, 185 So. 3d 1214, 1220 (Fla. 2016). When defending claims against its insured, an insurer in Florida "has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." *Bos. Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla. 1980) (per curiam). The insurer must make defense "decisions in good faith and with due regard for the interests of the insured." *Id.*

The good faith duty of an insurance company includes advising "the insured of settlement opportunities" and "the probable outcome of the litigation," as well as warning about "the possibility of an excess judgment" and informing "the insured of any steps he might take to avoid same." *Id.* "The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so." *Id.* But the good faith duty does not obligate an insurer to offer to settle for more than the policy limits. *See, e.g.*, *Kropilak v. 21st Century Ins. Co.*, 806 F.3d 1062, 1067 (11th Cir. 2015) ("Under Florida law, an insurer has a duty to defend its insured

against any claim and alleged facts within the terms of the policy and to indemnify the insured up to the limits of the policy.").

"[T]he question of whether an insurer has acted in bad faith in handling claims against the insured is determined under the 'totality of the circumstances' standard." *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 680 (Fla. 2004). Negligence is "relevant to the question of good faith," *Bos. Old Colony*, 386 So. 2d at 785, but negligence on its own is insufficient to demonstrate bad faith, *see Campbell v. Gov't Emps. Ins. Co.*, 306 So. 2d 525, 530 (Fla. 1974) (explaining that the standard is bad faith, not negligence). The focus of bad faith centers on the insurance company, but also relevant is a claimant's actions. *Pelaez v. Gov't Emps. Ins. Co.*, 13 F.4th 1243, 1254 (11th Cir. 2021) (concluding that it is proper to factor "a claimant's actions into the totality of the circumstances analysis"). Ordinarily, "[t]he question of failure to act in good faith with due regard for the interests of the insured is for the jury." *Bos. Old Colony*, 386 So. 2d at 785; *see, e.g.*, *Ilias v. USAA Gen. Indem. Co.*, 61 F.4th 1338, 1350 (11th Cir. 2023) (reversing grant of summary judgment to insurer). Along with proving bad faith, the plaintiff must prove that the claimed damages are "caused by the bad faith." *Perera v. U.S. Fid. & Guar. Co.*, 35 So. 3d 893, 901 (Fla. 2010).

GEICO argues that it is entitled to judgment as a matter of law because no reasonable jury could find that GEICO acted in bad faith in handling Willoughby's claim and causing the excess judgment. *See generally* MSJ. Willoughby responds that a

reasonable jury could find that GEICO acted in bad faith in (1) failing to settle
Willoughby's claims within the policy limits and (2) prohibiting Mrs. Ellison from
stipulating to a $4.8 million consent judgment. Resp. (Doc. 143) at 10–20.

### A. GEICO's Failure to Settle Willoughby's Claims in 2015

Willoughby's first argument arises out of GEICO's handling of settlement
negotiations in March and April 2015. In early March, Cathey made the following offer:
"In exchange for payment in the amount of $150,000, Randy Willoughby will sign a
general release of all his claims against the Ellisons arising from the collision on November
2, 2012, including all claims for taxable costs and attorneys fees." (Doc. 127-19) at 1.
Cathey later indicated that Willoughby would settle for less than $150,000, but he needed
"some kind of offer from Geico to acknowledge it owes something more than $100,000."
*Id.* at 6. GEICO, Cathey wrote, could even start by "offering $100,000 plus $200 if it
wants." *Id.* In a subsequent message to the Ellisons' counsel, Cathey "guarantee[d that] we
can settle this case" if "Geico can offer something over the $100,000." *Id.* at 10. GEICO,
though, rejected any attempt to settle the case for over the $100,000 bodily injury limit
even though it recognized that Cathey may have been seeking "an amount as little as $200"
above the $100,000 policy limit. (Doc. 127-23) at 1. Because of GEICO's rejection, the
litigation proceeded.

Willoughby argues that a reasonable jury could conclude that GEICO breached its duty to "settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so." *Bos. Old Colony*, 386 So. 2d at 785. GEICO contends that Willoughby's offer exceeded the $100,000 policy limit for bodily injury and that "an insurer cannot be found to have acted in bad faith where the insurer had no opportunity to settle the claim within the policy limits." MSJ at 13. The parties' disagreement stems from the extent of GEICO's coverage. Willoughby argues that there were four sources of coverage available to GEICO: the bodily injury policy limit; the provision that provides coverage for "[a]ll reasonable costs incurred by an insured at [GEICO's] request"; the property damage policy limit; and the provision that provides coverage for "[c]osts incurred by an[y] insured for first aid to others at the time of an accident involving an owned auto." Resp. at 2–7. GEICO argues only that the $100,000 bodily injury limit applied at the time of the parties' 2015 negotiations. MSJ at 9–13. Thus, the question for the purposes of summary judgment is whether a reasonable jury could conclude that, under the "totality of the circumstances," GEICO acted in bad faith in refusing to settle out of the belief that Willoughby's offer exceeded the applicable policy limit. *Berges*, 896 So. 2d at 680.

15

### 1. Taxable Costs

Starting with the provision concerning reasonable costs "incurred by an insurer at [GEICO's] request," when Cathey offered in March 2015 to settle the claim for $150,000, he mentioned authority supporting the proposition that this provision covered taxable costs. JSUF ¶ 20c, 20f; *see Fla. Ins. Guar. Ass'n, Inc. v. Johnson*, 654 So. 2d 239, 240 (Fla. 4th DCA 1995) (concluding that costs are covered by a policy provision that provides the insurer will pay "[o]ther reasonable expenses incurred at our request" (alteration in the original) (emphasis removed)). In Florida's Second District, though, where the underlying tort case was litigated, the District Court of Appeal had interpreted the same provision to mean only that "the insurer intended to pay for expenses that it had authorized and over which it had control, such as the selection of a service or product of known value and cost." *Steele v. Kinsey*, 801 So. 2d 297, 299 (Fla. 2d DCA 2001). The insurer is not obligated under this provision, the Second District Court of Appeal concluded, to cover "further litigation expense" that follows the rejection of a settlement offer, including "any fees and costs" to which the plaintiff may be entitled under a fee-shifting statute. *Id.* at 299–300.

*Steele* was binding precedent in the Second District when the parties negotiated in 2015. *See Pardo v. State*, 596 So. 2d 665, 667 (Fla. 1992) ("[I]f the district court of the district in which the trial court is located has decided the issue, the trial court is bound to follow it." (quoting *State v. Hayes*, 333 So. 2d 51, 53 (Fla. 4th DCA 1976))). Based on

*Steele*, GEICO argues that it did not act in bad faith in concluding that it was not obligated to cover taxable costs. MSJ at 12. The question is whether a reasonable jury could conclude that GEICO acted in bad faith notwithstanding *Steele*.

The answer is "no." A reasonable jury could not find that an insurance company acted in bad faith for following the law. To avoid that (what should be) obvious conclusion, Willoughby argues that *Steele* did not control because *Steele* concerned attorney's fees, not taxable costs. Resp. at 15; (Doc. 143-17) at 4 (trial court denying Steele's motion for attorney's fees). Therefore, regarding costs, Willoughby argues that the Fourth District's decision in *Johnson* controlled the trial court in this case. Resp. at 15; *see Pardo*, 596 So. 2d at 666 ("The proper hierarchy of decisional holdings would demand that in the event the only case on point on a district level is from a district other than the one in which the trial court is located, the trial court be required to follow that decision." (quoting *Hayes*, 333 So. 2d at 53)).

Although the ultimate judgment in *Steele* concerned attorney's fees, *Steele*'s reasoning was not dependent on some characteristic unique to attorney's fees but was instead the product of the policy language. *See* 801 So. 2d at 300 ("The words at issue here, 'reasonable expenses incurred at our request,' can only mean that the insurer must request the product or service that incurs the expense."). Nearly identical language appeared in the Ellisons' insurance policy, and there is nothing in *Steele* to suggest that the Second District

17

would reach a different decision as to taxable costs. *Cf. Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004) (emphasizing the importance of interpreting a statute consistently); *Ramos v. Louisiana*, 590 U.S. 83, 104 (2020) ("It is usually a judicial decision's reasoning—its *ratio decidendi*—that allows it to have life and effect in the disposition of future cases."). Indeed, although in a different context, the Second District applied the holding of *Steele* to a claim for attorney's fees and costs. *See Fla. Ins. Guar. Ass'n, Inc. v. All The Way With Bill Vernay, Inc.*, 864 So. 2d 1126, 1130 (Fla. 2d DCA 2003) ("[U]nder the plain language of [the] policies and the holding of *Steele*, the attorney's fees and costs incurred by [the insured] in defending the underlying action are not 'within the coverage of' the insurance policies.").

As a result, GEICO was perfectly justified in concluding, at the time of the 2015 negotiations, that *Steele* governed and that the policy did not obligate it to pay taxable costs. *See Eres v. Progressive Am. Ins. Co.*, 998 F.3d 1273, 1280 (11th Cir. 2021) (focusing on the state of the law at the time the insurer acted in evaluating the insurer's actions). An insurer "has a right to deny claims that it in good faith believes are not owed on a policy," *Vest v. Travelers Ins. Co.*, 753 So. 2d 1270, 1275 (Fla. 2000), and a reasonable jury could not conclude that GEICO acted in bad faith in the light of *Steele*.

Despite *Steele*, Willoughby contends that a reasonable jury could still find bad faith based on the "totality of the circumstances." Resp. at 14–16. Willoughby relies on *State*

18

*Farm Mutual Automobile Insurance Co. v. Laforet*, where the Florida Supreme Court enumerated factors a jury must consider in evaluating an insurer's handling of a coverage dispute. 658 So. 2d 55, 62–63 (Fla. 1995). Willoughby fails to point to a single case, though, where a court has held that a reasonable jury could find that an insurer acted in bad faith based on a coverage dispute concerning policy language that had already been interpreted by the relevant appellate court in the insurer's favor. Willoughby faults GEICO for failing to "make any effort to promptly resolve the coverage dispute," performing "no investigation into whether the taxable costs were owed beyond the off-the-cuff advice received from Young," and failing to "attempt to settle the claim for a compromised sum or reach a conditional settlement contingent upon a future coverage determination." Resp. at 15. But none of these criticisms change the outcome in the light of *Steele*, and thus a reasonable jury could not find bad faith in these circumstances in 2015.

### 2. Property Damages

Willoughby's next argument is predicated on GEICO's coverage of property damage. Although a close question, a reasonable jury could conclude that, in the light of the property damage provision of the policy and Willoughby's response to an interrogatory, GEICO acted in bad faith in handling settlement negotiations. Therefore, summary judgment is unwarranted on this theory.

When the parties negotiated in March and April 2015, GEICO was on notice that Willoughby claimed $230 in property damages. (Doc. 127-17) at 6 (Willoughby's interrogatory answers); Jones Dep. at 49:14–50:18 (testifying that GEICO received in September 2013 Willoughby's answers to interrogatories in which Willoughby enumerated $230 in property damages). The release form GEICO sent to Willoughby covered "any and all claims, demands, damages, actions, causes of action, or suits of any kind or nature whatsoever, on account of all injuries and damages, known and unknown, which have resulted or may in the future develop as a consequence of [the auto accident at issue]." (Doc. 127-19) at 4. Thus, by agreeing to settle, Willoughby would be discharging the Ellisons from responsibility for the property damages requested. Yet GEICO, even when Willoughby sought anything over $100,000—even "$200"—never included any money in a settlement offer from the property damage portion of the policy. As a result, GEICO is not entitled to summary judgment on this record.

Taking the facts in the light most favorable to Willoughby, GEICO could have known that its policy covered Willoughby's claimed property damages and Cathey's representations present a question of fact as to whether an offer above $100,000 could have settled the case and whether GEICO's failure to do so caused the ultimate excess judgment. A "reasonably prudent person, faced with the prospect of paying the total recovery," might have responded with a settlement offer worth the combined amount of the bodily injury

limit and Willoughby's claimed property damages. *Bos. Old Colony*, 386 So.2d at 785. From the record, nothing indicates that GEICO considered whether the property damage provision in the policy would make up the difference between the bodily injury limit and Willoughby's purported desired offer. Under these circumstances, a reasonable jury could conclude that GEICO failed to "give fair consideration to a settlement offer that is not unreasonable under the facts" and settle Willoughby's claim. *Id.*

GEICO responds that Willoughby's argument is based on "revisionist history." MSJ at 19. GEICO first argues that Willoughby's complaint in the underlying litigation "did not contain any claim for or allegation of property damage." *Id.* at 20. But the complaint's omission of any mention of "property damage" does not mean that Willoughby was foreclosed from seeking such damages in the underlying litigation. In Florida, so long as the opposing litigant is on notice, a plaintiff may amend her complaint to conform to the evidence presented at trial. *See* FLA. R. CIV. P. 1.190(b); *Tracey v. Wells Fargo Bank, N.A. as Tr. for Certificateholders of Banc of Am. Mortg. Sec., Inc.*, 264 So. 3d 1152, 1155–57 (Fla. 2d DCA 2019). Given Willoughby's answer to the Ellisons' interrogatory concerning damages, the Ellisons (and GEICO) were on notice as to Willoughby's desire to recover for property damage. Indeed, GEICO ultimately agreed to pay Willoughby's claim for property damage without any argument that this claim was forfeited. JSUF ¶ 37. Therefore, this case is distinguishable from the case on which GEICO relies, *Macola v.*

*Government Employees Insurance Co.*, where the plaintiff never "assert[ed] a claim for property damages in the underlying action." 410 F.3d 1359, 1361 n.2 (11th Cir. 2005).

GEICO's other argument is that Willoughby never stated during the 2015 negotiations "that he was making a combined claim for property damages and bodily injury damages." MSJ at 20. That is a correct account of the record and a sensible argument for the jury to consider. During negotiations, the parties were predominantly concerned with whether GEICO was responsible for taxable costs along with the $100,000 bodily injury limit. *See generally* (Doc. 127-19). But this fact is not dispositive as to whether GEICO properly handled Willoughby's claim. Although the claimant's actions are a factor to consider, *Pelaez*, 13 F.4th at 1254, the focus must remain on the actions of the insurer "in fulfilling its obligations to the insured," *Berges*, 896 So. 2d at 677.

Further, the cases GEICO relies on to make this point are distinguishable. In *Shin Crest PTE, Ltd. v. AIU Insurance Co.*, Shin Crest sued its insurer and argued that the insurer "breached its duty of good faith by settling the underlying personal injury claims for the policy limits on behalf of a co-insured, leaving Shin Crest exposed to its own defense costs and possible judgment." 368 F. App'x 14, 15 (11th Cir. 2010) (per curiam). The underlying tort plaintiffs contended that, if asked at mediation, they would have agreed to a global settlement releasing both Shin Crest and its co-insured. *Id.* But the Eleventh Circuit concluded that "there is no indication in the record that [the insurer] ever knew of

this potential concession." *Id.* In fact, the record conveyed the opposite. *Id.* The Eleventh Circuit therefore affirmed the grant of summary judgment to the insurer. *Id.* at 16–17.

GEICO also claims that the decision in *Mason v. State Farm Mutual Automobile Ins. Co.* demonstrates why summary judgment is justified in this case. No. 8:20-CV-2912-KKM-TGW, 2022 WL 4230055 (M.D. Fla. June 29, 2022), *report and recommendation adopted*, 2022 WL 3098387 (M.D. Fla. Aug. 4, 2022). There, the tort plaintiff's settlement demand included several conditions, one of which was documentation concerning the amount of available insurance on the date of the accident. *Id.* at *2. The plaintiff was not satisfied with the clarity of this documentation, so the insurer provided more. *Id.* at *3. The plaintiff remained of the belief that the insurer's response was insufficient but never made clear why he was unwilling to move forward with settlement negotiations. *Id.* at *3–4. In a subsequent bad faith action, the magistrate judge recommended granting summary judgment to the insurer, rejecting the argument that the insurer acted in bad faith in attempting to settle the claim. *Id.* at *7–9. Among other things, the magistrate judge pointed out that the plaintiff never communicated to the insurer the supposed insufficiency in the insurer's response. *See id.* at *7 ("[A]t no point during this three-year period did plaintiff's counsel tell State Farm that the plaintiff was not settling because the certified insurance policy was insufficient to prove the amount of insurance coverage on the date of the accident.").

This case is different than both *Shin Crest* and *Mason*. Willoughby communicated to GEICO that he sought to recover for both bodily injury and listed property damages in response to an interrogatory a couple of years earlier. Then, in settlement negotiations, Willoughby informed GEICO of his willingness to settle the case—or in other words, all his claims. That Willoughby never claimed property damages in his operative complaint or highlighted that portion of the policy coverage as a possible source of funding for his settlement offer are facts for the jury to consider in assessing GEICO's actions. In any case, a reasonable jury could find that a "person of ordinary care and prudence" in managing "his own business," would have inquired as to the nature of Willoughby's offer. *Bos. Old Colony*, 386 So. 2d at 785.

### 3. First Aid Provision

Under the Ellisons' policy, GEICO was obliged, upon request of the Ellisons, to provide reimbursement for "[c]osts incurred by any insured for first aid to others at the time of an accident involving an owned auto or non-owned auto." (Doc. 1-1) at 26. Willoughby argues that this provision renders GEICO liable to pay for the cost of Hillsborough County Fire Rescue coming to the scene and transporting Willoughby to Tampa General Hospital as well as the costs of emergency treatment at Tampa General Hospital. Resp. at 7; *see* (Doc. 143-8) (listing costs).

Willoughby does not identify any Florida decision interpreting this provision as he does. GEICO does not identify any Florida decision cutting its way either, but GEICO cites precedent from other jurisdictions and precedent from Florida interpreting "first aid" in another context. *See* Reply (Doc. 140) at 6–7. As a matter of first impression, GEICO has the better interpretation. And because it is a question of law as to what the policy covered—similar to the taxable costs provision already discussed—GEICO cannot be found to have acted in bad faith for not offering to cover expenses outside this policy provision. It also follows that a reasonable jury could not find that GEICO acted in bad faith by failing to independently identify this policy provision during settlement negotiations in 2015 without any notice that Willoughby sought these damages.

An insurance policy is construed according to its "plain meaning." *Parrish v. State Farm Fla. Ins. Co.*, 356 So. 3d 771, 774 (Fla. 2023). A court must read the policy as "a whole and undertake to give every provision its 'full meaning and operative effect.'" *Id.* (quoting *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000)). There are two main disagreements between the parties. First, the parties disagree as to what it means for an insured to "incur" expenses. Second, the parties disagree as to the types of treatments that constitute "first aid."

As for the first issue, Willoughby contends that an insured "incurs" costs when he is liable for the tort that necessitates the medical care. Resp. at 7. This reading renders, at

least in part, the bodily injury provision duplicative and fails to make sense of the entire policy. *See City of Homestead v. Johnson*, 760 So. 2d 80, 84 (Fla. 2000) (applying the rule "requiring courts to read provisions of a contract harmoniously in order to give effect to all portions thereof"); *Anderson*, 756 So. 2d at 34 "[U]nlimited coverage" for certain medical costs would have the effect in cases like this one of wiping away the applicable bodily injury limits. Resp. at 7.

GEICO's reading makes better sense of the policy in its entirety. According to GEICO, the provision applies when the insured incurs costs in rendering first aid. *See* Reply at 6–7. This interpretation eliminates the overlap that results from Willoughby's reading. Other sources suggest that the first aid clause also covers costs an insured accrues when he agrees or promises to pay for first aid. *See* Douglas R. Richmond, *The Subtly Important Supplementary Payments Provision in Liability Insurance Policies*, 66 DEPAUL L. REV. 763, 806 (2017). Either way, this narrower reading better fits the rest of the policy.

As for the definition of "first aid," Willoughby's reading again fails to fit with the rest of the policy and is contrary to the weight of the authority. For example, although not in this exact context, a Florida court has concluded that "[f]irst aid requires no more assistance than that which can be provided by an untrained person." *L.A. Fitness Int'l, LLC v. Mayer*, 980 So. 2d 550, 559 (Fla. 4th DCA 2008) (quoting *Pacello v. Wyndam Int'l, Inc.*, No. CV030477014S, 2006 WL 1102737, at *6 (Conn. Super. Ct. Apr. 7,

26

2006)); *accord Abramson v. Ritz Carlton Hotel Co., LLC*, 480 F. App'x 158, 162 (3d Cir. 2012) ("'[F]irst aid' involves simple procedures that can be performed with minimal equipment and training, such as bandaging and repositioning."). A court reviewing a similar policy to GEICO's interpreted "first aid" in much the same way. In *Erie Insurance Property & Casualty Co. v. Johnson*, the court, faced with a dispute much like this one, interpreted a first aid provision to "cover[] the costs, if any, incurred in providing immediate emergency medical care, rendered at the scene of the accident before trained medical personnel arrived and assumed control of [the plaintiff's] care." No. 6:09-CV-01532, 2011 WL 3607950, at *4 (S.D.W. Va. Aug. 15, 2011).[1] In a similar vein, a court in this circuit concluded that a "first aid" provision did not cover "medical bills from subsequent treatment in the emergency room." *Nationwide Prop. & Cas. Co v. Lacayo*, No. 2:07CV809-MHT, 2008 WL 4831743, at *3 (M.D. Ala. Nov. 3, 2008).

A dictionary definition lends support to these judicial interpretations. *See* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 685 (3d ed. 1992) (defining "first aid" to mean "[e]mergency treatment administered to an injured or sick person before professional medical care is available"). GEICO's reading also makes sense

---

[1] The provision at issue in *Johnson* provided that the insurer is responsible for "reasonable costs for first aid to other people and animals at the time of an accident involving an auto we insure." 2011 WL 3607950, at *3 (emphasis omitted).

in the light of the provision's coverage of costs incurred by the insured regarding "first aid to others *at the time of an accident.*" (Doc. 1-1) at 26 (emphasis added).

Therefore, even if Willoughby is correct that GEICO is responsible for first aid costs solely that arose out of Mr. Ellison's negligence, Willoughby fails to produce any particular evidence of such costs, as defined above. Instead, Willoughby merely gestures to "thousands of dollars in bills," including bills related to transportation and hospital care. Resp. at 7; *see* (Doc. 143-8). And, of course, Willoughby points to no evidence that he claimed "first aid" costs at the time of the settlement negotiations in 2015.

In the light of the best interpretation of this provision, Willoughby fails to convince that a reasonable jury could find that GEICO acted in bad faith by failing to conclude that the first aid provision provided a basis for covering the $50,000 difference between the bodily injury limit and Willoughby's $150,000 settlement offer.

## B. Later Opportunities to Settle

Willoughby also argues that a reasonable jury could find fault in GEICO's failure to settle in 2017 and 2019. As noted, the Florida Supreme Court disapproved *Steele* in 2017 before the underlying tort case proceeded to trial. *See Macedo*, 228 So. 3d at 1115. Therefore, after *Macedo*, GEICO should have been aware that its policy covered taxable costs. *See id.* ("[W]e hold that the ambiguous Additional Payments section of the GEICO insurance policy must be construed to provide coverage for the costs and attorneys' fees

awarded against [the insured] pursuant to the offer of judgment statute."). But, Willoughby says, GEICO continued in its refusal to offer them.

Willoughby first points to March 30, 2017, when Willoughby agreed to settle his claim against Mr. Ellison for $100,000. Resp. at 11. Cathey testified that Willoughby did not agree to settle with Mrs. Ellison at that point because GEICO still owed property damages and taxable costs. Cathey Dep. (Doc. 122-1) at 128:9–24. But this was before the Florida Supreme Court decided *Macedo*. *See* Resp. at 5 (recognizing that the Florida Supreme Court decided *Macedo* on July 13, 2017). Therefore, even assuming that Willoughby was willing to settle for taxable costs and property damages in March 2017 (and after both Willoughby settled with his uninsured motorist carrier for $4 million and the Ellisons "conditionally agreed to a stipulated judgment in the amount of $4.8 million," JSUF ¶¶ 19, 29), *Steele* was still good law in Florida's Second District.

Willoughby next points to January 2019, when Willoughby returned a release of his property damage claim. Resp. at 6, 11. At this time in the litigation, only Mrs. Ellison remained, and Willoughby had unsuccessfully offered to settle for $5 million and then $4.8 million. JSUF ¶¶ 26–27, 29–30, 32, 34–35.[2] Willoughby argues that, after *Macedo*, GEICO had an affirmative obligation to offer taxable costs and that GEICO's unwillingness to pay costs spoiled any chance at a settlement. *See* Resp. at 11–12; Cathey

---

[2] About a month later, in February 2019, Willoughby again proposed a stipulated $4.8 million consent judgment. JSUF ¶ 38.

Dep. at 140:9–16. GEICO argues that the record is without evidence that it was unwilling

to pay taxable costs and that "[Willoughby] never made a demand for taxable costs at this

time nor was there any liability at that time for taxable costs because they had not been

awarded." Reply at 5 n.6.

Taking the record in the light most favorable to Willoughby, GEICO is not entitled

to judgment on this theory. In response to a question asking why Willoughby did not settle

in 2019, Cathey responded that GEICO "still wasn't willing to pay [Willoughby]" taxable

costs. Cathey Dep. at 140:15–16. Although the jury may reject this assertion in the light

of Willoughby's offer only a few weeks later of a proposed consent judgment worth $4.8

million, *see* JSUF ¶ 38, summary judgment is unwarranted. A reasonable jury could find

that a reasonably prudent person would have affirmatively offered to pay the taxable costs

after *Macedo* and "[a]ny question about the possible outcome of a settlement effort should

be resolved in favor of [Willoughby]." *Powell v. Prudential Prop. & Cas. Ins. Co.*, 584 So.

2d 12, 14 (Fla. 3d DCA 1991).

## C. Consent Judgment in Excess of the Policy Limits

Willoughby's final argument is that GEICO acted in bad faith in refusing to allow

Mrs. Ellison to stipulate to a $4.8 million judgment in August 2017 and February 2019.

Resp. at 18–20. GEICO argues that Florida law is clear that an insurer may not be held

liable "for its actions regarding a proposal to enter into a consent judgment that is in excess
of the policy limits." MSJ at 18.

Recent Florida case law is in GEICO's favor. In *Markuson v. State Farm Mutual
Automobile Insurance Co.*, the tort plaintiff offered to settle his case so long as the insurer:
(1) tendered the policy limit; (2) authorized the insureds to enter a consent judgment in
excess of the policy limits that would not be recorded or enforced against the insureds; and
(3) authorized the insureds to assign to the tort plaintiff their right in any claims against
the insurer. 380 So. 3d 1258, 1259–60 (Fla. 2d DCA 2024). In return, the tort plaintiff
would execute a release of all his claims against the insured and a satisfaction of the consent
judgment. *Id.* at 1260. The settlement offers "made no indication that State Farm would
be released from any bad faith liability" and the insurer denied them. *Id.*

The tort plaintiff recovered over $3 million after trial, and then brought a bad faith
action against the insurer. *Id.* The insurer moved for summary judgment, arguing that "it
did not act in bad faith because the proposals for settlement included consent judgments
above the policy limits" and an insurer owes no duty to enter a consent judgment in excess
of the policy. *Id.* The trial court agreed with the insurer and entered partial summary
judgment on this basis. *Id.* at 1260–61. On appeal, the Second District Court of Appeal
affirmed and held that the insurer "had no duty to enter into a consent judgment in excess

of the limits of its policy." *Id.* at 1262–63.[3] The Second District Court of Appeal relied on

*Kropilak v. 21st Century Insurance Co.*, where the Eleventh Circuit held that an insurer

"has no duty on behalf of its insured to agree to a consent judgment in excess of policy

limits and then subject itself to a suit for bad faith for the amount in excess of the policy

limits." 806 F.3d 1062, 1069 (11th Cir. 2015).

  *Markuson* and *Kropilak* support GEICO's position that it owed no duty to

authorize a consent judgment exceeding its policy limits. Willoughby contests this

conclusion on three grounds. First, he argues that *Markuson* conflicts with the Florida

Supreme Court's decision in *Campbell*. In *Campbell*, the insurer failed to settle the claim

within policy limits and an excess judgment was entered against the insured. 306 So. 2d at

529–30. Pending appeal of this judgment, the tort plaintiff offered to settle the case for the

policy limit "plus an assignment from the insured of the latter's right of action against

carrier for failing to settle the case." *Id.* at 530. The insurer denied the offer and failed to

advise the insured of its existence. *Id.* The Florida Supreme Court, in the light of these

circumstances, reinstated a bad faith judgment against the insurer. *Id.* at 532.

  *Markuson* does not conflict with *Campbell*. As the Eleventh Circuit has recognized,

the claimant in *Campbell* "never sought to have the insurance company enter into a consent

---

[3] The Second District Court of Appeal, though, remanded for the trial court to consider other
theories of bad faith. *Markuson*, 380 So. 3d at 1263.

judgment against the insured in excess of the policy limits." *Kropilak*, 806 F.3d at 1069.

As a result, *Campbell* does not preempt *Markuson* on this issue.

Willoughby next points out that, by the time he offered the two consent judgments

at issue, GEICO's duty to defend was not based on the insurance policy but on the fact

that GEICO "voluntarily undertook to provide [Mrs. Ellison] with a continued defense."

Resp. at 19; *see Ging v. Am. Liberty Ins. Co.*, 423 F.2d 115, 120–21 (5th Cir. 1970)

(recognizing an insurer's good faith obligation when the insurer voluntarily undertakes a

defense). Willoughby does not explain how this alters the duty that GEICO owes to the

Ellisons. In other words, Willoughby fails to support the proposition that an insurer owes

a duty to authorize a consent judgment exceeding the policy limits when it voluntarily

undertakes the defense but not when it conducts the defense pursuant to a policy.

Finally, Willoughby argues that summary judgment is unwarranted because

authorizing consent judgments exceeding the policy limits is "consistent with industry

custom and practice." Resp. at 20. Even if industry custom can impose added duties on

GEICO,[4] the record, when taken in the light most favorable to Willoughby, fails to

identify an industry custom or practice of authorizing insureds to enter consent judgments

exceeding the policy limits. As evidence of industry custom, Willoughby relies on

---

[4] The one case Willoughby relies on, *Decamp v. State Farm Fire & Cas. Co.*, 572 F. Supp. 3d
1241 (M.D. Fla. 2021), does not hold that industry custom can establish duties that the law
otherwise affirmatively rejects.

testimony from the Ellisons' defense counsel, in which counsel states that GEICO previously has allowed an insured to sign a stipulation like those at issue here. Thompson Dep. (Doc. 123-1) at 33:6–10, 91:6–14. But Thompson does not speak to the frequency of such authorizations. Willoughby also cites a letter from a GEICO claims examiner in which the claims examiner informs GEICO's insureds that GEICO would not assert a breach of the policy contract if the insureds wished to accept proposals for settlement. (Doc 143-15). An example from one case is hardly evidence of industry custom. This case is far different from the one on which Willoughby relies, where the record demonstrated that the insurer had paid certain costs "in at least twelve instances in Florida since 2009." *Decamp v. State Farm Fire & Cas. Co.*, 572 F. Supp. 3d 1241, 1257 (M.D. Fla. 2021). For these reasons, this theory of bad faith cannot proceed to trial.

## IV.    CONCLUSION

A reasonable jury could conclude that GEICO acted in bad faith during the 2015 negotiations by failing to offer to pay Willoughby's claimed property damages, along with the bodily injury policy limit, and that this constituted bad faith causing Mrs. Ellison's excess exposure. A reasonable jury could reach the same conclusion regarding GEICO's failure to agree to pay taxable costs after the Florida Supreme Court's decision in *Macedo*. With respect to Willoughby's other theories of bad faith, GEICO is granted summary judgment.

Accordingly, it is **ORDERED**:

1.    GEICO's Motion for Summary Judgment (Doc. 128) is **GRANTED in**

**part** and **DENIED in part**.

**ORDERED** in Tampa, Florida, on March 31, 2025.

Kathryn Kimball Mizelle
United States District Judge